IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

LINDA BRANSCOMB,                    )
    Plaintiff,                       )
                                     )
        v.                      )     CIVIL NO. 3:12-cv-288-REP
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
    Defendant.                       )
_____ )

## REPORT AND RECOMMENDATION

Linda Branscomb ("Plaintiff") is 57 years old and previously worked as a purchasing

clerk, a sales correction clerk and a receptionist. On April 12, 2006, Plaintiff protectively

applied for Social Security Disability ("DIB") under the Social Security Act (the "Act"),

claiming disability due to diabetes, fibromyalgia, thyroid, acid reflux disease, high blood

pressure, anxiety attacks, irritable bowel syndrome and rheumatoid arthritis with an alleged onset

date of March 12, 2006. After Plaintiff's claim was denied by an administrative law judge

("ALJ"), Plaintiff appealed to this Court, which reversed and remanded the Commissioner's

decision on August 16, 2010 for further evaluation of Plaintiff's RFC, consideration of exertional

and non-exertional limitations, assignment of weight to the consultative examiners' and other

physicians' opinions and testimony from a VE, if necessary. *Branscomb v. Astrue*, 3:10cv228-

HEH (E.D. Va. Aug. 16, 2010).

Upon remand, Plaintiff's claim was again presented to an ALJ, who denied Plaintiff's

requests for benefits. The Appeals Council subsequently denied Plaintiff's request for review on

March 14, 2012. Plaintiff now challenges the ALJ's assignment of weight to her treating

neurologist's opinion. (Pl.'s Mem. of Points and Author. in Supp. of Mot. for Summ. J. ("Pl.'s

Mem.") at 15-23.) She further complains that the ALJ's assessment of credibility was unsupported by substantial evidence. (Pl.'s Mem. at 23-27.) Finally, Plaintiff alleges that her depression and anxiety were severe impairments. (Pl.'s Mem. at 27-29.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges the ALJ's assessment of her credibility, assignment of weight to the physician's opinions and determination that she did not have a severe mental impairment. Therefore, Plaintiff's educational and work history, physical and mental medical histories, medical opinions, reported activities of daily living and the hearing testimony are summarized below.

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## A.    Plaintiff's Educational and Work History

Plaintiff completed high school. (*See* R. at 42.) She earned an Associate's degree in secretarial science. (R. at 42, 462.) Plaintiff last worked on March 12, 2006. (R. at 43-44.)

At her last job, Plaintiff made computer chips where she stood for twelve hours a day and lifted heavy sleeves of chips that weighed approximately 15 pounds. (R. at 44-45.) She held that job for four years. (R. at 44.) Plaintiff quit, because the job was too hard on her body and mind. (R. at 62.)

Before that, Plaintiff was a purchasing clerk at Maxim Medical, where she sat at a desk with a computer and a telephone. (R. at 45.) She performed data entry for Electrolux. (R. at 45-46.) Plaintiff had also worked as a receptionist and a customer service representative. (R. at 46.)

## B.    Plaintiff's Physical Medical Records

On January 14, 2005, Plaintiff visited James P. Brodeur, M.D., E.A.C.P., a rheumatologist, and complained of severe fatigue and pain in her hips, knees, ankles, hands and elbows. (R. at 332.) She also indicated that her ankles swelled and that she had morning stiffness. (R. at 332.) Dr. Brodeur documented that Plaintiff had been diagnosed with rheumatoid arthritis in April 2004. (R. at 332.) He observed trigger points throughout Plaintiff's body. (R. at 333.)

Plaintiff visited Dr. Brodeur on April 19, 2006, complaining of morning stiffness that lasted for 15 minutes and constant knee, hip, hand and ankle pain. (R. at 324.) Plaintiff felt that therapy was helping somewhat, had no swollen joints, eight tender joints, 18 positive trigger points as well as bilateral ankle edema. (R. at 324.)

On April 27, 2008, Plaintiff visited her primary care physician, Hamdy I. Sayed, M.D., complaining of chest pain. (R. at 378.) Dr. Sayed noted ankle edema, no swelling in the hands

and chest pain that was "probably arthritic in origin." (R. at 378.) He assessed that Plaintiff had chest pain, peripheral edema, hypertension, diabetes type II, osteopenia, hyperlipidemia and fatigue secondary to fibromyalgia. (R. at 378.)

Two months later, Plaintiff returned to Dr. Sayed for a follow-up, who documented fatigue and body aches. (R. at 375.) That same month, Plaintiff reported 15 minutes of morning stiffness, hip and back-side pain, and general muscle burning to Dr. Brodeur. (R. at 322.) He observed no swollen joints, no tender joints and no ankle edema. (R. at 322.)

At a follow-up appointment with Dr. Brodeur in September 2006, Plaintiff indicated that her therapy was helping more and that she had no swollen or tender joints or trigger points. (R. at 321.) Plaintiff also reported that fatigue was a major problem, she had pain "as bad as it [could] be" and her condition was affecting her "very poorly." (R. at 320.) Although Dr. Brodeur observed that Plaintiff had 18 trigger points at her appointment, she had no swollen or tender joints. (R. at 319.) Plaintiff also visited Dr. Sayed twice in September 2006, who noted no edema and no neurological deficits. (R. at 368, 373.) Plaintiff did, however, complain of very poor energy, fatigue and problems with sleeping. (R. at 368.)

On October 26, 2006, Plaintiff visited Dr. Sayed, who documented that Plaintiff had some weakness and fatigue, but no edema. (R. at 366.) A few days later, Plaintiff reported to Dr. Brodeur morning stiffness, swelling in her knees, ankles as well as hands, and that Temazepam was not helping her sleep. (R. at 318.) Plaintiff had two swollen joints, six tender joints, slight ankle edema and depression/anxiety. (R. at 318.)

In January 2007, Dr. Brodeur noted that Plaintiff's morning stiffness lasted for 45 minutes, her shoulder was in pain and therapy was helping her. (R. at 317.) Plaintiff had no swollen or tender joints and 13 trigger points. (R. at 317.) Plaintiff also visited with Dr. Sayed,

4

who indicated that Plaintiff had lost 19 pounds from Weight Watchers and had no edema. (R. at 362.)

Plaintiff visited Dr. Sayed again in July 2007 to discuss her weight reduction. (R. at 357.) Dr. Sayed observed no edema and that exercise and a decrease in weight helped with Plaintiff's osteoarthritis. (R. at 357.) A month later, Plaintiff reported to Dr. Sayed that she felt lightheaded at times; Dr. Sayed observed that Plaintiff had no edema. (R. at 356.)

On October 1, 2007, Dr. Brodeur recorded no swollen joints, two tender joints and no ankle edema. (R. at 430.) Plaintiff complained of hip and knee pain as well as morning stiffness, but indicated that therapy was helping her. (R. at 430.) Two months later, Plaintiff reported to Dr. Brodeur that her therapy helped, but she still had pain in her hands and 45 minutes of morning stiffness. (R. at 429.) She had no swollen joints, tender fingers and slight bilateral ankle edema. (R. at 429.)

On January 2, 2008, Plaintiff returned to Dr. Brodeur, who observed no swollen or tender joints and 18 trigger points. (R. at 428.) A month later, Plaintiff complained to him about 30 minutes of morning stiffness and painful knees, hips as well as arms, but indicated that her therapy was helping. (R. at 427.) Plaintiff had no swollen or tender joints and two trigger points. (R. at 427.) That same month, Plaintiff visited Dr. Sayed, reporting two falls and a hurt left knee. (R. at 434.) Dr. Sayed noted no edema and normal joint and range of motion in her lower left side. (R. at 434.)

In April 2008, Plaintiff visited Dr. Brodeur and complained of 30 minutes of morning stiffness and knee, ankle as well as hand pain. (R. at 871.) She was fatigued, but Dr. Brodeur did not identify any swollen or tender joints or trigger points. (R. at 871.) On June 3, 2008, Plaintiff visited Dr. Sayed, who observed that Plaintiff was having difficulty with her weight,

trying to be as active as she could be and feeling out of breath. (R. at 846.) Plaintiff had no swelling of the legs, ankles, hands or wrists and no edema. (R. at 846.) A month later, Plaintiff had diarrhea and edema in her feet. (R. at 844.)

Plaintiff told Dr. Brodeur in August 2008 that therapy was helping her, but she had morning stiffness all day, pain in her right hand, swollen hands and fatigue. (R. at 870.) She had multiple trigger points, puffy hands and right ankle edema. (R. at 870.) In September 2008, Plaintiff visited Dr. Sayed, complaining that her right ankle had been swollen and painful when she walked. (R. at 839.) Dr. Sayed noted that Plaintiff's ankles were swollen and tender, but she had a full range of motion and strength. (R. at 839.)

On October 3, 2008, Plaintiff visited Dr. Brodeur, stating that therapy was helping, she had 10 minutes of morning stiffness as well as knee, neck and foot pain. (R. at 869.) Plaintiff had no swollen or tender joints, multiple trigger points, fatigue and pedal edema. (R. at 869.) A few weeks later, Plaintiff discussed being scheduled for a gastric bypass surgery with Dr. Sayed. (R. at 837.) Plaintiff complained of anxiety attacks. (R. at 837.) She continued to exercise for one hour interrupted daily, tried to be as active as possible when she went shopping and had no edema. (R. at 837.) However, on November 19, 2008, Plaintiff had "plus/minus edema in both lower extremities." (R. at 816.)

Plaintiff suffered from 10 minutes of morning stiffness, pain in her knees, back and feet, fatigue, nausea and diarrhea on December 3, 2008. (R. at 868.) She told Dr. Brodeur that Lyrica helped with her burning pain. (R. at 868.) Plaintiff had swollen hands, no tender joints, pedal edema and multiple trigger points. (R. at 868.)

In February 2009, Plaintiff told Dr. Brodeur that therapy was helping her condition, she had no morning stiffness or painful joints, but did have fatigue. (R. at 867.) She had no swollen

or tender joints and 12 trigger points. (R. at 867.) A month later, Plaintiff discussed with a colleague of Dr. Sayed the passing of her son-in-law and her trouble sleeping. (R. at 831.) Plaintiff's Zoloft was increased due to her depression and anxiety. (R. at 831.)

In April 2009, Plaintiff reported no morning stiffness or painful joints, although her hands were swollen. (R. at 864.) She had puffy knees, tenderness in her ankle and wrists, but no trigger points. (R. at 864.) On May 19, 2009, Dr. Sayed noted that Plaintiff had no edema. (R. at 830.) About a week later, Plaintiff still had no edema. (R. at 829.)

On July 21, 2009, Plaintiff visited Dr. Brodeur complaining of hip, knee and finger pain. (R. at 862.) She had swollen wrists and knees as well as tender joints, but no trigger points. (R. at 862.) Two months later, she had no morning stiffness or painful joints, lost twenty pounds, had no swollen or tender joints and had two trigger points. (R. at 860.)

On October 6, 2009, Plaintiff visited Dr. Sayed and complained of back pain and nausea. (R. at 823.) She had no edema and normal motor function and senses. (R. at 823.) One month later, Plaintiff complained of anxiety and depression; she was prescribed Prozac because she stopped taking Zoloft as prescribed. (R. at 817.) In December 2009, Plaintiff visited Dr. Brodeur and had a little morning stiffness, nausea all the time as well as swollen knees, finger joints and ankles. (R. at 857.) She also visited Dr. Sayed, who documented that Plaintiff had no major complaints, an improved mood and energy from her Prozac and well-controlled rheumatoid arthritis pain. (R. at 798.)

On February 9, 2010, Plaintiff reported to Dr. Brodeur that she had a painful neck, no morning stiffness and nausea. (R. at 856.) Patient notes indicated that Plaintiff had swollen knees and ankles, but no tender joints. (R. at 856.) Two months later, Plaintiff complained of

hip pain and had no morning stiffness, one swollen joint, tender hips and ankle edema. (R. at 854.)

In July 2010, Plaintiff reported to Dr. Brodeur that the therapy was helping her, she had no morning stiffness, she had hand and finger pain and she was exercising and stretching. (R. at 852.) Plaintiff had diarrhea, swollen ankles, fingers and wrists, tender ankles and wrist as well as ankle edema. (R. at 852.) Two months later, Plaintiff reported morning stiffness, pain in her toe and hands as well as no energy. (R. at 849.) Dr. Brodeur observed swollen and tender hands and toe along with 12 trigger points. (R. at 849.) In November 2010, Plaintiff had painful hands and knees, swollen ankles and finger, two tender joints and ankle edema. (R. at 847.)

## C.   Plaintiff's Mental Medical Records

On May 13, 2009, Plaintiff participated in an intake session with Kathleen McCune, Ph.D.[2] (R. at 716.) Patient notes described Plaintiff's depression as "significant" and recommended counseling to address grief issues, interpersonal sensitivity and coping with depression. (R. at 716.) A few weeks later, Plaintiff's mood was sad with a flexible affect. (R. at 717-18.) In June, Plaintiff's mood improved to euthymic. (R. at 719.) She stated that she would like to have a part time office job, but worried that her rheumatoid arthritis and fibromyalgia were not manageable. (R. at 719.) Her mood continued to be euthymic, although Plaintiff expressed sadness for not being able to participate in the activities she performed before her rheumatoid arthritis diagnosis. (*See* R. at 720-21.)

On July 6, 2009, Plaintiff participated in a psychiatric diagnostic interview examination. (R. at 722.) Patient notes documented that Plaintiff's anxiety and depression were exacerbated

---

[2] Because Plaintiff's mental health records were unsigned, it is difficult to determine with whom Plaintiff spoke. (*See* R. at 716-30.) However, the cover page of these records indicated that Dr. McCune was Plaintiff's primary provider and an examination noted that Dr. McCune had been seeing Plaintiff. (*See* R. at 715, 722.)

by her son-in-law's death, Plaintiff's anxiety and depression increased her chronic fibromyalgia pain and Plaintiff labeled herself as a "hypochondriac." (R. at 722.) Plaintiff's Global Assessment of Functioning ("GAF")[3] was evaluated at 58.[4] (R. at 724.) Plaintiff had a depressed mood, restricted affect and no suicidal ideations. (R. at 724.) She was diagnosed with depressive order, not otherwise specified, as well as anxiety disorder, not otherwise specified and recommended a trial of Cymbalta. (R. at 724.)

On July 23, 2009, Plaintiff's mood was described as euthymic. (R. at 725.) She learned that her rheumatoid arthritis factor was higher than she believed and refused to read a book on her illness, "because of concern about suggestibility." (R. at 725.) A few weeks later, Plaintiff reported that she could not tolerate Cymbalta and had an "alright" mood. (R. at 726.) She refused depression medication, accepted a trial of Ambien, had "no impairing symptoms of depression," and was assigned a GAF of 58. (R. at 726-27.)

In August 2009, patient notes indicated that Plaintiff's mood was euthymic, affect was flexible and appearance was friendly as well as insecure. (R. at 728.) A few weeks later, Plaintiff's mood, affect and appearance were unchanged. (R. at 729.) Plaintiff requested a refill of Ambien in October 2009 and had an unchanged mood, affect and appearance in November 2009. (R. at 730.)

---

[3] The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc., 32 (4th Ed. 2002) (hereinafter "*DSM-IV*").

[4] A GAF of 51-60 is defined as "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

**D.    The Opinions of Plaintiff's Treating Physicians**

On February 27, 2008, Dr. Sayed completed a Physical RFC Questionnaire. (R. at 438-42.) Dr. Sayed had been treating Plaintiff for approximately four years for fibromyalgia, rheumatoid arthritis, diabetes, hypertension, an intolerance of stress, chronic pain and fatigue. (R. at 438.) He rated Plaintiff's prognosis as fair or guarded and documented pain and muscle spasms that were consistent with Plaintiff's low stress tolerance and chronic fatigue. (R. at 438.) Plaintiff had a low tolerance to cold. (R. at 438.)

Dr. Sayed listed that Plaintiff had limitations with the range of motion of her joints, tenderness at her trigger points and lab results that supported Plaintiff's illnesses. (R. at 438.) Side effects of Plaintiff's medication included drowsiness, nausea, vomiting, diarrhea, dizziness and fatigue. (R. at 438.) Dr. Sayed expected that Plaintiff's impairments would last at least 12 months. (R. at 438.) He marked that Plaintiff was not a malingerer, was depressed and anxious, constantly experienced pain and was incapable of tolerating low stress jobs due to her pain and fatigue. (R. at 439.)

Plaintiff could walk half a city block, sit for 45 minutes at a time and stand for 30 minutes at a time. (R. at 439.) She could only sit, stand or walk for less than two hours during an eight-hour workday. (R. at 440.) Dr. Sayed marked that Plaintiff would need to walk every 30 minutes for five minutes at a time and that Plaintiff required a job that allowed her to shift positions at will and take unscheduled breaks every 30 minutes for 15 minutes at a time. (R. at 440.) Plaintiff's legs should be elevated almost all day to reduce edema swelling. (R. at 440.) She could rarely carry less than 10 pounds, look down, turn her head, look up, hold her head in a static position, twist, stoop or climb stairs and could never crouch or climb ladders. (R. at 440-41.) Dr. Sayed opined that Plaintiff was limited with temperature extremes, wetness, humidity,

noise and dust. (R. at 441.) He noted that Plaintiff could use her hands, fingers and arms for under five percent of an eight-hour workday and that she would be absent from work for more than four days a month. (R. at 441.)

Dr. Brodeur also completed a RFC Questionnaire on February 27, 2008, diagnosing Plaintiff with rheumatoid arthritis, diabetes, hypertension, depression and anxiety, all with a good prognosis. (R. at 443-47.) Dr. Brodeur had been following Plaintiff since January 2005 and expected her impairments to last at least twelve months. (R. at 443.) He marked that Plaintiff had multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, irritable bowel syndrome, anxiety and depression. (R. at 443.)

Dr. Brodeur documented that Plaintiff experienced constant pain, was incapable of low stress jobs and experienced drowsiness as a side effect of her medication. (R. at 444.) Plaintiff could walk one half to one city block before requiring rest, could sit or stand for 20 minutes before needing to change positions and could sit or stand for less than two hours during an eight-hour workday. (R. at 444.) She would need to walk around during the day approximately every 20 minutes for five minutes at a time. (R. at 445.) Plaintiff would need to be able to shift positions at will at work, take an unscheduled break for three to five minutes every 20 minutes where she would lie down or sit quietly and elevate her legs during times of prolonged sitting. (R. at 445.)

Plaintiff could rarely carry less than 10 pounds or hold her head in a static position and never twist, stoop, crouch or climb ladders. (R. at 445-46.) Plaintiff could occasionally look down, turn her head left or right or look up. (R. at 446.) Dr. Brodeur opined that Plaintiff had significant limitations in performing repetitive reaching, handling or fingering. (R. at 446.) He noted that Plaintiff could use her hands, fingers and arms for under 10% of an eight-hour

workday and that she would be absent from work for more than four days a month. (R. at 446.) Dr. Brodeur further opined that Plaintiff was 100% disabled. (R. at 446.)

On January 27, 2011, Dr. Sayed completed an RFC Report, in which Dr. Sayed marked that Plaintiff would need to alternate between sitting and standing or walking every 150 minutes. (R. at 873.) He opined that Plaintiff could only sit for four hours during an eight-hour workday, would require low stress jobs with no contact with the public, perform no work in tandem and lift five pounds occasionally with no frequent lifting. (R. at 874.) Dr. Sayed marked that Plaintiff had severe interference in her right and left extremities, which limited her ability to perform fine and gross dexterous movements. (R. at 874.)

E.     The Medical Consultation Report of Christopher Newell, M.D.

On August 22, 2006, Christopher Newell, M.D., examined Plaintiff. (R. at 297-300.) Plaintiff had a history of fibromyalgia and rheumatoid arthritis. (R. at 297.) She described her pain as aching and burning and reported diarrhea, nausea and vomiting. (R. at 297.) Plaintiff stopped working because her job required repetitive movement, which caused muscle and joint pain. (*See* R. at 298.)

Dr. Newell observed that Plaintiff was friendly, cooperative, alert and oriented with a normal mood and affect. (R. at 298.) She was slow getting on and off the examination table and had a mild antalgic gait. (R. at 298.) Plaintiff had trigger points all over her body. (R. at 299.) Her knees and ankles were swollen and tender. (R. at 299.) Although she had tenderness among her left hand, she had a 4/5 grip strength and could take a paper clip from the table. (R. at 299.)

Dr. Newell diagnosed Plaintiff with rheumatoid arthritis, fibromyalgia, hypertension, gastroesophageal reflux disease and anxiety. (R. at 299.) He opined that Plaintiff could stand and walk for two to four hours during an eight-hour workday, sit for about six hours during an

eight-hour workday and carry 10 pounds frequently and occasionally. (R. at 299-300.) She could reach, handle, feel, grasp and finger occasionally and was limited in bending, stooping and squatting. (R. at 300.)

**F.     The Consultative Mental Status Examination Report of Linda M. Dougherty, Ph.D.**

Plaintiff arrived 20 minutes early for her consultative examination with Linda M. Dougherty, Ph.D., on April 17, 2008. (R. at 461.) She reported that she had no energy, felt fatigued and was depressed. (R. at 461-62.) Plaintiff's depression began when she had a mastectomy for breast cancer; after that, she had panic attacks. (R. at 462.) Dr. Dougherty documented that Plaintiff was independent in most of her activities of daily living ("ADLs"), could prepare simple meals and clean-up after herself. (R. at 462.) On a typical day, Plaintiff watched television, read, talked on the telephone and studied the Bible. (R. at 462.)

Dr. Dougherty noted that Plaintiff was alert and oriented with normal gait and posture, as well as direct eye contact. (R. at 462-63.) Plaintiff's speech and language were normal, thought processes were clear and coherent and thought content was appropriate. (R. at 463.) Plaintiff had a neutral affect and congruent mood. (R. at 463.) She felt sad most of the time and lost interest and enjoyment in activities. (R. at 463.) Plaintiff felt fatigued constantly, slept "okay" with medication, thought people were better than she and sometimes felt punished or like a failure. (R. at 463.) She rated herself as most depressed on a scale of one to ten and reported feeling nervous and worrying sometimes. (R. at 463.) Plaintiff had anxiety attacks once a month and rated herself as a five on a scale of one to ten for anxiety. (R. at 463.) She had not sought mental health treatment for her depression or anxiety. (R. at 464.)

Dr. Dougherty diagnosed Plaintiff with mood disorder due to a general medical condition and anxiety disorder, not otherwise specified, because her symptoms were not "severe enough"

to warrant a "specific diagnosis." (R. at 464.) She assigned Plaintiff a GAF of 60. (R. at 464.) Dr. Dougherty assessed Plaintiff's prognosis as guarded and noted that she could benefit from mental health treatment. (R. at 464.) She opined that Plaintiff could perform simple, repetitive tasks and moderately detailed, complex tasks. (R. at 465.) Plaintiff could maintain regular attendance in the workplace and complete a normal workday, but may need additional supervision to perform work activities. (R. at 465.) She could have difficulty accepting instructions from supervisors and interacting with people. (R. at 465.) Dr. Dougherty opined that Plaintiff would become more depressed when encountering the usual stresses in a competitive workplace. (R. at 465.) She marked that Plaintiff had only mild or no limitations in her abilities to perform certain tasks. (R. at 466-47.) Plaintiff was mildly impaired with her ability to understand and remember or carry out complex instructions; to make judgments on complex work-related decisions; and respond appropriately to usual work situations and to changes in routine. (R. at 466-67.)

## G.     The Opinions of Non-Treating State Agency Physicians

On August 25, 2006, William Martin, Jr., M.D., a non-treating state agency physician, opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours in an eight-hour workday, sit for about six hours during an eight-hour workday and push or pull unlimitedly. (R. at 309-14.) Dr. Martin determined that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. at 310-11.) Although he agreed that Plaintiff was impaired by rheumatoid arthritis and fibromyalgia, Dr. Martin opined that Plaintiff had the RFC to perform light work. (R. at 313-14.) On February 16, 2007, Martin Cader, M.D., a non-treating state agency physician, affirmed Dr. Martin's opinion that Plaintiff could perform light work. (R. at 353.)

## H.    Plaintiff's Activities of Daily Living

On June 2, 2006, Plaintiff completed a Fatigue Questionnaire, writing that she had had

fatigue since 2004 and became very weak and nauseated when she attempted to complete a task.

(R. at 161-62.)  Plaintiff could no longer perform housework, walk, shop or work.  (R. at 161.)

When she took a shower, she felt like she would pass out.  (R. at 161.)  She shopped for

groceries every two weeks and no longer attended church or visited with friends at her house,

because of her fatigue.  (R. at 161.)  Plaintiff could not walk very far, but needed to rest for 30 to

60 minutes after she walked.  (R. at 161.)  She required eight to ten hours of sleep, frequently

rested and napped three times a day.  (R. at 162.)

That same day, Plaintiff completed a Pain Questionnaire, indicating that she experienced

aching, burning pain in her hips, elbows, hands, fingers, toes and neck.  (R. at 163-64.)  If she

stood too long her hips would hurt or ankles would swell; when she bent or squatted, her knees

would hurt.  (R. at 163-64.)  When Plaintiff worked on the computer, her elbows, fingers and

hands would hurt.  (R. at 163.)  Reaching hurt her neck and elbows.  (R. at 164.)  Plaintiff took

methotrexate, hydroxycloroquine, cyclobenzaprine and tamezpan, and experienced drowsiness as

a side effect.  (R. at 164.)

In a Function Report, dated June 2, 2006, Plaintiff marked that she lived in a house with

family and wrote that she attempted to perform housework, took a shower, rested and ate daily.

(R. at 165-72.)  Plaintiff could not sleep, bend or stand for long periods of time.  (R. at 166.)  She

could make sandwiches and cereal.  (R. at 167.)  Plaintiff indicated that it took her about two

days to perform normal household chores, because she had to lie down often when she became

extremely fatigued.  (*See* R. at 167-68.)  She drove for doctors' appointments and short trips

around town and bought clothes, books and groceries in the store. (R. at 168.) Plaintiff enjoyed reading, walking, shopping and socializing with her friends and family. (R. at 169.)

Plaintiff marked that she was limited with lifting, walking, stair climbing, squatting, sitting, bending, kneeling, standing, reaching and concentrating. (R. at 170.) She could only lift five pounds, stand less than five minutes and walk for about 15 minutes. (R. at 170.) Walking, standing, squatting, bending and reaching aggravated her joints. (R. at 170.) Plaintiff could pay attention, follow written and spoken instructions, got along with authority figures, handled stress "okay" and took "a while" to adjust to a new routine. (R. at 170-71.) Plaintiff wrote that she had flare-ups without warning and would rest all day when she had a flare-up. (R. at 172.)

In February 2007, Plaintiff completed another Function Report, where she again explained that she attempted to perform light housework, but would become extremely fatigued and lie down. (R. at 183-90.) She no longer prepared any meals and her husband performed all chores around the house. (*See* R. at 185.) While Plaintiff continued to shop for clothes and books, she went to the grocery store with her husband about once a month. (R. at 186.) She attended Weight Watchers meetings each week, if she could. (R. at 187.) Plaintiff marked that her memory as well as the use of her hands were affected by her conditions and that she could not lift anything heavier than a gallon of milk or squat, bend, reach or walk short distances. (R. at 188.) She could walk for about 15 minutes at a time and required a 15 to 20 minute break. (R. at 188.) Plaintiff could not handle stress well and did not like routine changes. (R. at 189.)

Plaintiff continued to complain of an aching, burning pain in her neck, hips, elbows, fingers, knees, ankles, toes and hands in a Pain Questionnaire dated February 8, 2007. (R. at 199-200.) Standing, bending, squatting, sitting and using a computer exasperated the pain in her joints. (R. at 199-200.) Side effects from her medicine continued to be drowsiness. (R. at 200.)

A typed Function Report and Pain Questionnaire dated April 16, 2007, were completed by Plaintiff's counsel and reiterated her February 2007 responses. (*See* R. at 211-18.)

On January 17, 2011, Lisa Thomas, Plaintiff's long-time friend, wrote a letter discussing Plaintiff's active life style before her illness. (R. at 713.) Ms. Thomas observed that Plaintiff had difficulty with simple household tasks, tired easily and did not have enough strength to stand for long periods of time. (R. at 713.) Charles M. Branscomb, Plaintiff's son, also wrote a letter discussing Plaintiff's inability to perform simple tasks, Plaintiff's weakness and the illnesses' impact on Plaintiff's mental health. (R. at 714.)

## I.    Plaintiff's Testimony

On March 3, 2008, Plaintiff appeared before the ALJ stating that, in an average week, she drove once a week to her doctor's office or the grocery store. (R. at 38, 43.) She indicated that she could no longer work due to extreme fatigue, pain, weakness as well as stress, and that she had been told by doctors to stop working. (R. at 47, 51-52.) Plaintiff had pain over her entire body and took Plaquenil along with Tylenol for her pain as well as Methotrexate for her rheumatoid arthritis and Amitriptyline for her fibromyalgia. (R. at 47.) While her medication somewhat relieved her pain, it did not completely take her pain away. (R. at 47.) Plaintiff rated her pain at a 10 on a scale out of 10. (R. at 48.) She took Temazepam as a sleep aid, but Plaintiff only slept for six to eight hours a night, which were not restful. (R. at 49-50.) She napped for about thirty minutes a day. (R. at 50.) Side effects from her medications included drowsiness and nausea. (R. at 51.)

In a typical day, Plaintiff was on her feet for about two hours and sitting in a recliner, on the couch or in bed the balance of the day. (R. at 59.) Plaintiff testified that she could only stand or sit for five minutes; after that time, her hips or knees began to hurt. (R. at 48-49.) She could

17

carry nothing heavier than a gallon of milk. (R. at 48.) Plaintiff could only walk a half a city block, had problems with walking and would stumble after her legs became weak. (R. at 49.) She never visited the emergency room as a result of a fall and had no assistive devices prescribed for her. (R. at 49.) Plaintiff's joints and hands were frequently swollen. (R. at 49.) Plaintiff stated that she had problems with her balance and had numbness, tingling, temporomandibular disorder as well as acid reflux. (R. at 60, 62-63.) Plaintiff could not handle the stress associated with her family or work. (R. at 61.)

Plaintiff had tender lymph nodes, joint pain and swelling in her knees, ankles, hands, knuckles and elbows, muscle pain and headaches every day. (R. at 54-55.) Plaintiff rated her headaches as an eight or 10 and indicated that stress, the sun and weather triggered them. (R. at 55.) Her vision was sensitive to light and she became light-headed if she was standing. (R. at 56.) Because Plaintiff had irritable bowel syndrome, she had accidents when she left the house. (R. at 57-58.)

Plaintiff did not shop, cook or clean around her house. (R. at 50.) Plaintiff enjoyed reading and socializing with friends and family. (R. at 50-51.) She did not need any help with her personal care. (R. at 51.)

Although she had not seen a psychiatrist or therapist, she took medication for anxiety and depression, which helped her symptoms. (R. at 52.) Plaintiff had problems looking at her computer screen, which gave her headaches. (R. at 53.) She testified that her short-term memory and concentration were not very good, but she could watch a program on television. (R. at 53.) Additionally, Charles Branscomb, Plaintiff's son, testified that Plaintiff spent most of her time in bed, did not cook or clean and could not work. (R. at 64-65.)

On March 30, 2011, Plaintiff again appeared before the ALJ and testified that she had not worked or volunteered since March 2008 and stopped grocery shopping in 2007, because she could not grasp or lift objects and was pained as well as fatigued. (R. at 537-42.) She bought books online once a month, but was a slow reader because she could not concentrate for long periods of time and had trouble with her hands. (R. at 543.) Plaintiff only drove to doctors' appointments and left the house about once every six weeks. (R. at 544-45.) Since 2006, her husband and son performed 99.9% of the housework. (R. at 546.) Plaintiff stopped attending Weight Watchers meetings, because she was too fatigued. (R. at 546-47.) Although she was seeing a therapist in 2009, doing so was cost-prohibitive. (R. at 547-48.) Regardless, she continued to have frequent crying spells and believed her depression was not under control, because she was constantly sad. (R. at 548-50.)

Plaintiff stated that she was on her feet for 12 hours a day and constantly used her hands at her last job at a memory chip manufacturing outfit. (R. at 551-52.) As a purchasing clerk, she constantly used the computer, was sedentary and never lifted objects. (R. at 552.) At Electrolux, Plaintiff was a sales corrections clerk and made corrections to invoices in a computer. (R. at 553.) She was constantly on the computer. (R. at 554.)

Plaintiff also worked part-time at a local newspaper in a sedentary position. (R. at 554.) Before that, she was a customer service clerk with AT&T, where she would speak with customers on the phone and frequently enter data. (R. at 555.) Plaintiff indicated that she could no longer use her hands, because they flared unpredictably; therefore, it would be hard for her to maintain a position, especially one that required the use of a computer. (R. at 556-57.) She testified that, when she drove for 15 minutes to visit her doctor, her ankles and hands would become swollen and she was told to keep her feet elevated to stop the swelling. (R. at 560.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on April 12, 2006, claiming disability due to diabetes, fibromyalgia, thyroid, acid reflux disease, high blood pressure, anxiety attacks, irritable bowel syndrome and rheumatoid arthritis with an alleged onset date of March 12, 2006. (R. at 103, 145.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[5] (R. at 68-69.) An ALJ denied Plaintiff's claim, which was not reviewed by the Appeals Council. (R. at 3-5, 23-33.) Plaintiff appealed to this Court, which reversed and remanded the Commissioner's decision for further evaluation of Plaintiff's RFC, consideration of exertional and non-exertional limitations, assignment of weight to the consultative examiners' and other physicians' opinions and testimony from a VE, if necessary. *Branscomb v. Astrue*, 3:10cv228-HEH (E.D. Va. Aug. 16, 2010); (*see also* R. at 586-87).

On March 30, 2011, Plaintiff testified at a hearing before an ALJ. (R. at 537.) On April 5, 2011, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 515-28.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on March 14, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 474-77.)

## III. QUESTIONS PRESENTED

Was the Commissioner's evaluation of the opinions of Plaintiff's treating neurologist supported by substantial evidence on the record and the application of the correct legal standard?

---

[5] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

Did substantial evidence support the Commissioner's determination that Plaintiff's depression and anxiety were not severe impairments?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation

omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[6] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

_____

[6] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[7] based on an assessment of the claimant's residual functional capacity ("RFC")[8] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The

---

[7] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[8] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

On April 5, 2011, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since March 12, 2006, her alleged onset date. (R. at 517-18, 528.) At step two, the ALJ determined that Plaintiff was severely impaired from rheumatoid arthritis, fibromyalgia and obesity. (R. at 518-21.) The ALJ noted that Plaintiff indicated that her primary care physician, Dr. Sayed, proscribed Zoloft, Prozac and Zolidine for her depression and panic attacks. (R. at 518.) In 2009, Plaintiff saw a therapist, but had to stop because she could not afford the cost. (R. at 518.) She testified that she cried two or three times per week and was sad, anxious and withdrawn. (R. at 518.) In 2006 and 2007, Plaintiff wrote that she drove only to doctors' appointments and occasionally left the house to shop for groceries or to attend Weight Watchers meetings. (R. at 518.)

In 2005, Dr. Sayed noted mild depression and anxiety and prescribed Zoloft. (R. at 518.) The ALJ also summarized Dr. Brodeur's records, which diagnosed Plaintiff with anxiety and depression, and Dr. Dougherty's consultative evaluation, which diagnosed Plaintiff with a mood

disorder due to a general medical condition as well as a anxiety disorder and assigned Plaintiff a GAF of 60. (R. at 518-19.) In 2009, Plaintiff returned to counseling, but the ALJ noted that he was unsure whether a psychiatrist, psychologist or therapist treated her, as the records were unsigned. (R. at 519.) Plaintiff was diagnosed with major depressive disorder with borderline personality features and prescribed Prozac by Dr. Sayed. (R. at 519.) She reported that the Prozac improved her mood and energy. (R. at 519.)

The ALJ determined that Plaintiff's symptoms of depression and anxiety were mild in nature, because her symptoms were sufficiently treated with medications obtained from her primary care physician. (R. at 519-20.) Similarly, Dr. Dougherty determined that Plaintiff only had mild functional limitations. (R. at 520.)

Because her depression and anxiety did not cause more than minimal limitations with her ADLs, the ALJ determined that those conditions were "not severe." (R. at 520.) Continuing, the ALJ used the "paragraph B" criteria to determine that Plaintiff had mild limitations with her ADLs, because she was independent in her ADLs; had mild limitations in her ability to function socially, because she occasionally shopped with friends and family and had no limitations on her ability to interact with the public, supervisors or co-workers; had mild limitations in her concentration, persistence or pace, because she had an average memory and not more than mild limitations on her ability to understand, remember and carry out complex instructions; and no episodes of decompensation. (R. at 520-21.)

At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 521.) The ALJ then determined that Plaintiff had the RFC to perform the full range of sedentary work. (R. at 521.) The ALJ summarized Plaintiff's written statements, which alleged that she was disabled due to

25

rheumatoid arthritis, fibromyalgia, diabetes, hypertension, along with other conditions. (R. at 522.) She experienced pain in her neck, elbows, hands, fingers, hips, knees, ankles and toes. (R. at 522.) Plaintiff was fatigued, had reduced stamina and was limited in her ability to lift, handle items, carry items, bend, stoop, squat, sit and stand. (R. at 522.) Her medications caused drowsiness. (R. at 522.) Plaintiff could take care of her personal needs, but had trouble bending to put on her socks and shoes. (R. at 522.) She could perform light household chores and prepare simple foods. (R. at 522.) Plaintiff drove short distances and, before her husband took over, went shopping a few times a month. (R. at 522.)

Plaintiff testified that she could not lift anything heavier than a gallon of milk, sit or stand for more than five minutes or walk for more than half a block. (R. at 522.) Her son testified that she spent most of her day in bed. (R. at 523.) Plaintiff testified that she shopped for books on the computer, stopped grocery shopping and performing housework, drove to doctors' appointments when necessary and took care of her personal needs without assistance. (R. at 523.) Because she was fatigued, she missed many Weight Watchers appointments. (R. at 523.)

Plaintiff testified that she was depressed, but was only taking medication prescribed by her primary care physician. (R. at 523.) She stated that she could not perform her past work, because she experienced swelling and pain in her hands two to three times per week. (R. at 523.) Written statements from friends and family discussed Plaintiff's difficulty performing tasks. (R. at 523.)

The ALJ determined that Plaintiff's statements were not entirely credible. (R. at 523.) He then summarized medical records, which indicated that Plaintiff was treated for rheumatoid arthritis and fibromyalgia by Dr. Vuyyuru, a rheumatologist. (R. at 523.) Plaintiff's conditions

were under control with treatment and Plaintiff indicated that she wanted to return to work. (R. at 523.) Physical therapy helped her fibromyalgia symptoms. (R. at 523.)

Plaintiff began treatment with Dr. Brodeur, an arthritis specialist, in 2005. (R. at 523.) The ALJ noted that her primary care physician, Dr. Sayed, documented that Plaintiff had no hand or finger swelling, but reported pain related to her fibromyalgia and arthritis as well as fatigue. (R. at 524.) Dr. Newell, a consultative examiner, diagnosed Plaintiff with rheumatoid arthritis, fibromyalgia, hypertension, gastreoesophageal reflux disease and anxiety. (R. at 524.) He noted that she had eighteen trigger points and mild tenderness and swelling in her finger joints with a slight decrease in motion. (R. at 524.) Further, Dr. Newell opined that Plaintiff could stand and walk for two to four hours during an eight-hour workday, sit six hours, lift or carry 10 pounds frequently and occasionally reach, handle, feel, grasp and finger. (R. at 524.) He also noted that Plaintiff might need limitations on bending, stooping and squatting. (R. at 524.)

Dr. Brodeur reported no swollen or tender joints at the end of 2006 and beginning of 2007. (R. at 524.) Plaintiff joined Weight Watchers, lost weight and exercised to help her osteoarthritis. (R. at 524.) In the Fall of 2007, Dr. Brodeur documented some tenderness in Plaintiff's wrists and fingers, but documented no swollen or tender joints in early 2008. (R. at 524.) Dr. Sayed noted that Plaintiff had had two falls by February 2008, but no bone fractures. (R. at 524.)

Both Dr. Brodeur and Dr. Sayed opined that Plaintiff had constant pain that interfered with her attention and concentration, could sit less than two hours in an eight-hour day, could stand or walk less than two hours in an eight-hour day, would need to change positions at will and have unscheduled work breaks and could lift or carry less than 10 pounds rarely. (R. at 524.) Further, the doctors determined that Plaintiff could not perform low stress jobs and was limited

in her ability to stoop, bend, crouch and climb. (R. at 524.) Plaintiff would need to elevate her legs when sitting, had significant limitations with repetitive reaching, handling or fingering and would have more than four absences per month. (R. at 534.) Additionally, Dr. Brodeur opined that Plaintiff could not remain competitive in the work force and was 100% disabled. (R. at 524.)

The ALJ summarized additional medical records, which indicated that Plaintiff reported to Dr. Sayed that she exercised for an hour daily in October 2008, she attempted to stay active by going shopping and she had no musculoskeletal complaints through 2009. (R. at 524-25.) Dr. Brodeur's records reflected that Plaintiff's joints were occasionally swollen or tender. (R. at 525.) In 2011, Dr. Sayed opined that Plaintiff could sit for only four hours a day and lift less than five pounds occasionally. (R. at 525.) Plaintiff's impairments caused a severe interference with her gross and dexterous movements in her upper extremity. (R. at 525.) Finally, Dr. Sayed determined that Plaintiff was limited to low stress jobs with no public contact that did not require tandem work with another person. (R. at 525.)

The ALJ noted that while the Plaintiff had obesity, rheumatoid arthritis and fibromyalgia, she had intermittent pain and swelling in her joints, "no signs of upper extremity symptoms" and controlled symptoms with limited treatment. (R. at 525.) Plaintiff's depression and anxiety were treated with prescription medication that was prescribed by her primary care physician. (R. at 526.) The ALJ then assessed little weight to the non-treating state agency physicians' opinions that Plaintiff had an RFC for the full range of light work. (R. at 526.) He gave great weight to consultative examiner Dr. Dougherty's opinion that Plaintiff's depression and anxiety were not severe, because "that assessment [was] consistent with her limited treatment for those conditions and . . . these conditions have not had more than a minimal effect on her ability to function." (R.

at 526.) Dr. Newell's opinion was given limited weight, because he had only examined Plaintiff on one occasion and his objective findings were minimal. (R. at 526.) Additionally, the ALJ determined that Dr. Newell's objective findings did not support a less than sedentary RFC. (R. at 526.)

Noting that treating physicians should be assigned controlling weight if their opinions are supported by the objective medical evidence, the ALJ gave Dr. Sayed's opinions minimal weight, because they were not supported by his treatment notes, and gave Dr. Brodeur's opinion limited weight due to the "intermittent nature of [Plaintiff's] hand and finger symptoms with no contemporaneous assessment of function, coupled with the routine and conservative nature of prescribed treatment (i.e., only the prescription of medications)." (R. at 526-27.) Finally, the ALJ noted that the objective findings and assessments of the consultative examiners and treating physicians established that Plaintiff was severely limited from her obesity, fibromyalgia and rheumatoid arthritis but, with medications, could perform the full range of sedentary work. (R. at 527.)

At step four, the ALJ assessed that Plaintiff was capable of performing her past work as a purchasing clerk, a sales correction clerk and a receptionist. (R. at 527-28.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from March 12, 2006. (R. at 528.)

Plaintiff asserts that the ALJ should have assigned controlling weight to Dr. Brodeur's opinion. (Pl's. Mem. at 15-23.) She further complains that the ALJ's assessment of credibility was unsupported by substantial evidence. (Pl.'s Mem. at 23-27.) Finally, Plaintiff alleges that Plaintiff's depression and anxiety were severe impairments. (Pl.'s Mem. at 27-29.) Conversely,

Defendant argues that substantial evidence supported the ALJ's decision. (Def.'s Mot. for

Summ. J. and Brief in Supp. Thereof ("Def.'s Mem.") at 9-13.)

## A. Substantial evidence supported the ALJ's assignment of weight to Dr. Brodeur's opinion.

Plaintiff challenges the ALJ's decision, arguing that Dr. Brodeur's opinion should have

been assigned controlling weight, because he was Plaintiff's treating neurologist. (Pl.'s Mem. at

15-23.) While Dr. Brodeur was Plaintiff's treating neurologist, the ALJ assigned his opinion

limited weight due to the "intermittent nature of [Plaintiff's] hand and finger symptoms with no

contemporaneous assessment of function, coupled with the routine and conservative nature of

prescribed treatment (i.e., only the prescription of medications)." (R. at 527.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments which would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered.

*See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions,

including those from the Plaintiff's treating physicians, consultative examiners or other sources

that are consistent with each other, then the ALJ makes a determination based on that evidence.

*See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective

weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if: (1) it is well-supported by medically-acceptable clinical and

laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in

the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the

regulations do not require that the ALJ accept opinions from a treating physician in every

situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for

purposes of employment (an issue reserved for the Commissioner), or when the physician's

opinion is inconsistent with other evidence, or when it is not otherwise well supported.[9] *Jarrells

v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also*

20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

On February 27, 2008, Dr. Brodeur completed a RFC Questionnaire. (R. at 443-47.) He

marked that Plaintiff had multiple tender points, non-restorative sleep, chronic fatigue, morning

stiffness, irritable bowel syndrome, anxiety and depression. (R. at 443.) Dr. Brodeur

documented that Plaintiff experienced constant pain, was incapable of low stress jobs and

experienced drowsiness as a side effect of her medication. (R. at 444.)

Dr. Brodeur opinioned that Plaintiff could walk one half to one city block before

requiring rest, could sit or stand for 20 minutes before needing to change positions and could sit

or stand for less than two hours during an eight-hour workday. (R. at 444.) She would need to

walk around during the day approximately every 20 minutes for five minutes at a time. (R. at

445.) Plaintiff would need to be able to shift positions at will at work, take an unscheduled break

---

[9] If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ
assesses the weight of the opinion by considering: (1) the length of the treatment relationship
and the frequency of examinations; (2) the nature and extent of the treatment relationship,
including the treatment provided and the kind of examination or testing performed; (3) the
degree to which the physician's opinion is supported by relevant evidence; (4) consistency
between the opinion and the record as a whole; (5) whether or not the physician is a specialist in
the area which an opinion is rendered; and (6) other factors brought to the Commissioner's
attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines
v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

for three to five minutes every 20 minutes where she would lie down or sit quietly and elevate her legs during times of prolonged sitting. (R. at 445.)

Plaintiff could rarely carry less than 10 pounds or hold her head in a static position and never twist, stoop, crouch or climb ladders. (R. at 445-46.) Plaintiff could occasionally look down, turn her head left or right or look up. (R. at 446.) Dr. Brodeur opined that Plaintiff had significant limitations in performing repetitive reaching, handling or fingering. (R. at 446.) He noted that Plaintiff could use her hands, fingers and arms for under 10% of an eight-hour workday and that she would be absent from work for more than four days a month. (R. at 446.) Dr. Brodeur further opined that Plaintiff was 100% disabled. (R. at 446.)

Plaintiff argues that Dr. Brodeur's opinions are consistent with substantial evidence in the record, because they "virtually match" those of Dr. Sayed's opinions and his "physical findings on examination match those of Dr. Newell." (Pl.'s Mem. at 17.) She points out that Plaintiff's hands, fingers or wrists were either tender or swollen for eight of her 14 visits with Dr. Brodeur. (Pl.'s Mem. at 19.) Plaintiff argues that the ALJ was therefore cherry-picking the evidence. (Pl.'s Mem. at 20.)

Before Dr. Brodeur's opinion, patient notes documented that Plaintiff occasionally reported morning stiffness or swollen ankles. (R. at 317-18, 322, 324, 332, 427-29.) However, during that same period of time, patient notes indicated on many occasions that Plaintiff had no swollen joints or edema. (R. at 317, 319, 321-22, 324, 356-57, 366, 368, 373, 378, 427-28, 430, 434.) In fact, from 2006 through early 2008, Plaintiff's hands were only discussed four times. (R. at 318, 324, 332, 429.) Additionally, Plaintiff reported on many occasions that she felt therapy was helping her. (R. at 321, 324, 427, 430.) By the time Dr. Brodeur opined on Plaintiff's condition, medical records did not support his opinion.

After Dr. Brodeur's opinion, patient notes indicated Plaintiff's weight loss. (*See* R. at 362, 860.) In September 2008, Plaintiff was observed by both Drs. Sayed and Brodeur to have swollen ankles. (R. at 839, 870.) In October 2008, Plaintiff reported to Dr. Sayed that she continued to exercise for one hour uninterrupted and attempted to be as active as possible when shopping. (R. at 837.) Plaintiff had swollen hands and pedal edema in December 2008 and her hands were swollen again in April 2009. (R. at 864, 868.)

She reported to Dr. Brodeur in 2009 and 2010 that therapy was helping her condition. (R. at 852, 867.) In December 2009, Dr. Sayed observed well-controlled rheumatoid arthritis pain. (R. at 798.) During a visit to Dr. Brodeur that month, Plaintiff was observed with swollen knees, finger joints and ankles. (R. at 857.)

Dr. Brodeur documented in July 2010 that therapy was helping and she was exercising and stretching, but that she had hand and finger pain. (R. at 852.) In September and November 2010, Plaintiff had swollen and tender areas in her hands. (R. at 847, 848.) Additionally, Plaintiff's medications throughout the relevant time period included Plaquenil along with Tylenol for her pain as well as Methotrexate for her rheumatoid arthritis and Amitriptyline for her fibromyalgia. (R. at 47.) She also took Temazepam as a sleep aid. (R. at 49.)

Patient notes throughout the relevant period — both before and after Dr. Brodeur's opinion — did not support his opinion. Even if Plaintiff was having flare-ups outside doctors' visits, the patient notes did not often document them. Additionally, Dr. Brodeur's patient notes consisted of five main categories of information: whether therapy was working, Plaintiff's complaints, trigger points, swollen joints and tender points. His notes did not include observations as to Plaintiff's gait, range of motion or ability. In fact, at the two instances where

Plaintiff's range of motion was documented, Dr. Sayed observed that it was normal. (R. at 434, 839.)

Plaintiff also argues that Dr. Newell's report supported Dr. Brodeur's opinion. (*See* Pl.'s Mem. at 17-18.) It did not. In August 2006, Dr. Newell observed that Plaintiff was slow getting on and off the examination table and had a mild antalgic gait. (R. at 298.) Her knees and ankles were swollen and tender. (R. at 299.) Although she had tenderness among her left hand, Plaintiff had a 4/5 grip strength and could take a paper clip from the table. (R. at 299.) As such, Dr. Newell opined that Plaintiff could occasionally reach, handle, feel, grasp and finger. (R. at 300.) Despite Dr. Newell's reported observations and opinions, Dr. Brodeur opined that Plaintiff had significant limitations in performing repetitive reaching, handling or fingering. (R. at 446.)

While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2). Because Dr. Brodeur's opinion was not supported by substantial evidence, the ALJ properly assigned his opinion limited weight.

**B.      Substantial evidence supported the ALJ's assessment of Plaintiff's credibility.**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by

the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

Plaintiff alleges that the ALJ's listing of Plaintiff's ADLs did not indicate her ability to perform competitive work. (Pl.'s Mem. at 25.) She complains that the ALJ mischaracterized statements, such as her rheumatoid arthritis being well-controlled, and discredited her. (Pl.'s Mem. at 24.) Not only was such a statement in the record (R. at 798), but Plaintiff also reported to Dr. Sayed in October 2008 that she continued to exercise for one hour uninterrupted and attempted to be as active as possible when shopping. (R. at 837.) In contrast, Plaintiff testified

to the ALJ in March 2008 that she was on her feet for about two hours in a typical day and sitting in a recliner, on the couch or in bed the balance of the day. (R. at 59.) She stated that she could only stand or sit for five minutes; after that time, her hips or knees began to hurt. (R. at 48-49.) Plaintiff's statements in March 2008 to the ALJ contradicted her statements to Dr. Sayed in October 2008, thus reducing her credibility with regard to her reported abilities.

Next, Plaintiff argues that the nature of her disease would not warrant emergency room treatment, hospitalization or surgery and that she should not be penalized by the conservative nature of her medical care. (Pl.'s Mem. at 24-26.) Continuing, she asserts that the objective findings supported her position. (*See* Pl.'s Mem. at 26.) As discussed above, the objective medical evidence did not support the opinion of Plaintiff's treating neurologist. As such, the ALJ's statements with regard to her conservative nature of medical care were not incorrect.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Because substantial evidence supported his decision, the ALJ did not err in reaching his credibility evaluation.

**C.      Substantial evidence supported the ALJ's determination that Plaintiff's depression and anxiety were not severe impairments.**

Plaintiff asserts that her depression and anxiety impaired her to the point that they should have been considered "severe" by the ALJ. (Pl.'s Mem. at 27.) The second step of an ALJ's analysis requires a claimant to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles her to benefits under the Act, it must cause more than a minimal effect on her ability to function. 20 C.F.R. § 404.1520(c). An impairment is not severe if it "has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1982).

Because Plaintiff has mental impairments, the Commissioner must evaluate the evidence to determine to what degree those impairments interfered with the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis" in the areas of activities of daily living, social functioning and concentration, persistence or pace. 20 C.F.R. § 404.1520a(c)(2)-(3). Additionally, the Commissioner must ascertain whether the claimant had any episodes of decompensation. *Id.* at § 404.1520a(c)(3).

Dr. Dougherty evaluated Plaintiff on April 17, 2008. (R. at 461.) In her report, she marked that Plaintiff had only mild or no limitations in her abilities to perform certain tasks. (R. at 466-67.) Plaintiff was mildly impaired with her ability to understand and remember or carry out complex instructions; to make judgments on complex work-related decisions; and to respond appropriately to usual work situations and to changes in routine. (R. at 466-67.) Dr. Dougherty also documented that Plaintiff was independent in most of ADLs. (R. at 462.) Although Plaintiff rated herself as most depressed on a scale of one to ten and reported feeling nervous and

worrying sometimes, she had not sought mental health treatment for her depression or anxiety. (R. at 463-64.) Plaintiff also reported anxiety attacks once a month and rated herself as a five on a scale of one to ten for anxiety. (R. at 463.)

Dr. Dougherty diagnosed Plaintiff with mood disorder due to a general medical condition and anxiety disorder, not otherwise specified, because her symptoms were not "severe enough" to warrant a "specific diagnosis." (R. at 464.) She assigned Plaintiff a GAF of 60. (R. at 464.) She assessed Plaintiff's prognosis as guarded and noted that she could benefit from mental health treatment. (R. at 464.) Dr. Dougherty opined that Plaintiff could perform simple, repetitive tasks and moderately detailed, complex tasks. (R. at 465.) Plaintiff could maintain regular attendance in the workplace and complete a normal workday, but may need additional supervision to perform work activities. (R. at 465.) She could have difficulty accepting instructions from supervisors and interacting with people. (R. at 465.) Dr. Dougherty opined that Plaintiff would become more depressed when encountering the usual stresses in a competitive workplace. (R. at 465.)

In 2009, Plaintiff participated in an intake session with Dr. McCune, who described Plaintiff's depression as "significant" and recommended counseling to address grief issues, interpersonal sensitivity and coping with depression. (R. at 716.) She later participated in a psychiatric diagnostic interview examination; the report described that Plaintiff's anxiety and depression were exacerbated by her son-in-law's death, Plaintiff's anxiety and depression increased her chronic fibromyalgia pain and Plaintiff labeled herself as a "hypochondriac." (R. at 722.)

Plaintiff's GAF was evaluated at 58. (R. at 724.) She was diagnosed with depressive order, not otherwise specified, as well as anxiety disorder, not otherwise specified, and

recommended a trial of Cymbalta. (R. at 724.) Plaintiff reported that she could not tolerate Cymbalta and had an "alright" mood. (R. at 726.) She refused depression medication, accepted a trial of Ambien, had "no impairing symptoms of depression," and was again assigned a GAF of 58. (R. at 726-27.)

Both in 2008 and 2009, Plaintiff's GAF was evaluated in the same range, indicating that she had "[m]oderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers)." *DSM-IV* at 34. However, patient notes contradicted this assessment. In 2009, Plaintiff had "no impairing symptoms of depression." (R. at 726-27.) She was independent in most of her ADLs and had only mild or no limitations in her abilities to perform certain tasks in 2008. (R. at 462, 466-67.) Plaintiff was mildly impaired with her ability to understand and remember or carry out complex instructions; to make judgments on complex work-related decisions; and to respond appropriately to usual work situations and to changes in routine. (R. at 466-67.) She was also diagnosed with unspecified anxiety, because her symptoms were not "severe enough" to warrant a "specific diagnosis." (R. at 464.)

As the ALJ noted, Plaintiff's symptoms of depression and anxiety were mild in nature, because her symptoms were sufficiently treated with medications obtained from her primary care physician. (*See* R. at 519-20.) In fact, she refused treatment for depression in 2009 from her therapist. (R. at 726-27.) As such, the ALJ did not err when he determined that Plaintiff's depression and anxiety were not severe impairments, as also determined by the consultative examiner.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to Plaintiff and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: December 7, 2012